*ALBANY, Dec. 1831.*

*President, &c. of Brooklyn v. Patchen.*

---

## THE PRESIDENT AND TRUSTEES OF BROOKLYN *vs.* PATCHEN.

The trustees of the village of Brooklyn have no power under the act incorporating the village, and the act amending the same, passed in 1824, to lay out a *new street*, without the *consent* of the owners of the land over which the same is laid.

A court of common pleas, to whom an assessment of damages in the laying out of a street is to be returned, and who are to give judgment upon such assessment, have no authority to enquire into the regularity of the incipient proceedings; if error occurs in such proceedings, the remedy of a party affected is by *certiorari* directed to the officers before whom they were had, by *injunction* restraining the proceedings, or by action of *trespass :* the court, however, may require that enough shall be shewn to give them jurisdiction in the matter.

All persons are competent to serve as jurors in such cases, who are not the owners of property liable to assessment by reason of the intended street.

The ministerial duties of a sheriff may be executed by deputy.

Where a sheriff or other officer is authorized to select and summon a jury, he cannot after summoning a person to serve as a juror discharge him from attendance, and summon another in his stead; if the officer after hearing his excuses summons the juror, he can subsequently be discharged only by the court before whom he is required to attend.

Where power is delegated to a *court* in relation to the laying out of streets, all the ordinary powers of a court applicable to the subject matter may be exercised; subpœnas for witnesses may be awarded, the proceedings may be adjourned, and all other powers incident to a court in the administration of justice exercised.

The refusal of a subordinate tribunal to grant a new trial, or to postpone the trial of a cause, is no ground for a *writ of error ;* but when palpable injustice has been done by such tribunal in the exercise of its discretionary pow-

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

er, in opposition to *settled principles* of law and equity, their decision may be corrected by *certiorari* or *mandamus*, as in this case where a hearing was improperly refused to be postponed.

Where, in the laying out of streets, a *view* is demanded by either party, *shewers* should be appointed and sworn to shew the premises, under the direction of the sheriff.

ERROR from the supreme court. The trustees of the village of Brooklyn laid out a street, and appropriated to that object certain lands belonging to one Jacob Patchen. The proceedings of the trustees were consummated in the court of common pleas of the county of Kings, who rendered judgment in favor of Patchen for the amount at which his damages had been assessed by a jury. Patchen being dissatisfied with such amount, sued out a *certiorari*, removing the proceedings into the supreme court, and there assigned various errors committed in the course of the proceedings. The supreme court *reversed* the judgment of the common pleas, and the trustees of Brooklyn sued out their writ of error to this court.

By the act incorporating the village of Brooklyn, Laws of 1816, page 95, § 16, the trustees are clothed with all the powers of *commissioners of highways* within the limits of the village, subject to the restrictions imposed upon commissioners by the general highway act. By the 18th section of the act incorporating the village, the trustees are required to cause a survey of the village to be made, and a map to be prepared, exhibiting the streets, roads and alleys to be permanently laid out, and to be deposited with the clerk of the corporation, for the purpose that no resident might plead ignorance of the *permanent plan* to be adopted for opening, laying out, levelling and regulating the streets of the village. In 1824, the act incorporating the village was amended, Laws of 1824, page 224, and by the fifth section of that act the trustees are authorized upon application to *widen and alter* all public roads, streets and highways already laid out in the village, to a breadth not exceeding sixty feet; and to *lay out and make* such *other roads and streets* as they shall think necessary or convenient for the village, *if the owner or owners* of the lands through which such new roads and streets are to run, *will on reasonable recompense consent to the same.*

On the 30th September, 1825, the trustees of Brooklyn made a requisition upon the first judge of Kings to issue a precept to the sheriff of the county, commanding him to summon a jury to enquire of and assess the damages and recompense due to Jacob Patchen, in consequence of the trustees having ordered and directed that a new street should be opened, and that a certain parcel of land belonging to Patchen should be converted to and used for the purpose of opening such street; the trustees further represented that they had caused notice of their order to be given to Patchen, and that he had refused to treat or agree with them for the premises for a reasonable compensation. The first judge issued a precept accordingly, returnable at the then next court of common pleas, to be holden in October. The common pleas on the second day of the October term was adjourned on account of the sickness and absence of one of the judges, without having proceeded to the trial of any causes, and the processes and proceedings depending in court were continued until the third Tuesday of April then next. On the 22d March, 1826, the first judge of Kings issued another precept to the sheriff, reciting the requisition made upon him, the issuing of the former precept, the neglect of the sheriff to return the same, and then commanding the sheriff to summon a jury for the purpose set forth in the first precept; which second precept was made returnable on the third Tuesday of April then next, at which time the sheriff returned the same, with a panel of jurors annexed. Patchen moved to set aside the panel, on the ground that the panel returned varied from a copy furnished him three days previous to the return day of the precept, in the substitution of two persons as jurors, in place of two named in the copy furnished; and that when the copy was furnished only eleven jurors had been summoned. He also objected to the array because the jury had been summoned by a *deputy sheriff*, and that the jurors came from the village of Brooklyn; all which objections were overruled. Patchen further objected that the trustees were bound to shew the *regularity* of the incipient proceedings in the case, previous to the application to the first judge for a precept; the court decided that the trustees were not bound to do so,

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

and that the court ought not to enquire into the regularity of such proceedings. It was then objected by Patchen that he had a house on the premises taken for the street, (which fact was admitted,) and it was insisted that the act of the legislature under which the proceedings were had, did not authorize the taking or removal of such house. This objection was also overruled. It was next objected that notice of the application to the trustees for the laying out of the street had not been given to Patchen, or published in the newspapers printed in the village; which objections were also overruled. Patchen then applied for a postponement of the proceedings, on the ground of the absence of a material witness, who had been duly subpœnaed, which application was denied. Whereupon the jury were sworn, and informed by the court that such of them as wished, might view the premises of Patchen, and attend the court the next day. On the next day the jury came into court, and Patchen, on an affidavit offered to be made of the continued absence of his witnesses, and that one of them had repeatedly offered him $17,500 for the property in question, and that due diligence had been used to procure his attendance, again asked for a postponement of the proceedings, when the court ruled, that if the proposed affidavit was made, the cause could not be adjourned, and that the same would not be available to put off the cause. A witness for the trustees then testified that the property of Patchen in question was worth $5,500. Another, called by the trustees, was set aside, it appearing that he was the owner of property liable to assessment for the expenses of opening the street. No witnesses were called by Patchen; his counsel cross-examined the witnesses on the part of the trustees, and summed up the cause, (reserving all objections made, and overruled by the court.) The jury retired under the charge of the court, in the care of a constable, and returned with a verdict of $6700, as the amount of damages and recompense awarded to Patchen; on which verdict the common pleas gave judgment.

The supreme court set aside the proceedings, on the grounds, 1. That the application for a postponement of the hearing ought to have been granted; and 2. That the jury when they had a *view* of the premises, should have been attended by an

officer. See opinion delivered in the supreme court by the chief justice, 2 Wendell, 377.

*J. Greenwood,* for plaintiffs in error. It was in the *discretion* of the common pleas whether they would put off the assessment of damages or not, and their decision upon the application for a postponement could not properly be made the subject of review on error in the supreme court. The *certiorari* was in the nature of a *writ of error;* its object was to remove the *record,* and not the incidental proceedings in the case. Tidd's Pr. 341, 1051. The grounds upon which the supreme court proceeded were not properly before them, and although contained in the return, should have been disregarded. 2 Caines, 179. In mere matters of *practice,* such as giving or refusing time to plead, setting aside defaults, and the like cases, subordinate tribunals have an *absolute discretion,* in the exercise of which a court of review will not control them; and if they err, there is no remedy. Great inconveniences may accrue in such cases, it is admitted, but it is better they should exist than that questions of this kind should be brought up on writ of error. Where there is a discretion in a subordinate tribunal, even a *mandamus* will not be allowed. Skin. 290. Strange, 881. 2 W. Black. 708. Verdicts have been set aside when courts improperly refused to put off trials; 5 Cowen, 15; 6 id. 577: but trials have been refused to be postponed where there was reason to believe that the object was delay, and that the testimony wanted could not be material. 4 Burr. 1513. In the present case there was no necessity for a postponement, the party could have obtained sufficient proof on the spot as to the value of his property; and from the nature and subject matter of the inquiry, the witnesses, on account of whose absence a postponement was asked, could not be material, in the proper sense of the term. The proceedings, from their very nature, required to be prompt and summary, and the discretion of the court was properly exercised; but if otherwise, there was no remedy. The refusal of an inferior court to put off the trial of a cause, is not the subject of a writ of error, 4 Cranch, 237; nor can their refusal to give leave to amend, by adding pleas, be reviewed on writ of error. 6 Cranch, 206. See also, 2 Dallas, 42.

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

Cranch, 11, 187, 280.   7 id. 152. 2 Wheaton, 306.   19 Johns. R. 337.   Judgments of justices of the peace have been reversed for refusals by justices to put off trials, but such reversals were had under the broad powers given to the supreme court to render judgment according as the very right of the case should appear.

The statute under which the proceedings were had, contemplated a present proceeding at the term when the precept was returnable, and the judges had no power to postpone; they acted as *commissioners*, and not as a court, 7 Johns. R. 541 ; there was nothing in their acts partaking of a judicial character.   They had not the power to adjourn the proceedings, 8 Cowen, 13, and it may be questioned whether any benefit could accrue from a postponement, as it is submitted whether in cases of this kind it is contemplated by the legislature that *witnesses should be examined.*   The statute is silent on the subject, and in practice, witnesses are not examined by the commissioners of estimate, in the city of New-York, nor by commissioners under the general highway act.

The judgment should not have been reversed by the supreme court, for the cause that the jury were not attended by an officer when they *viewed* the premises.   It does not appear affirmatively that the officer did not attend, and the presumption is, from the absence of an objection at the time, that the party assented. 2 Wendell, 352.   At all events, there being no complaint of abuse or improper practice, the judgment should not for this cause have been reversed.   1 Cowen, 221. 4 id. 26. 5 id. 283.

In anticipation of the grounds which will be assumed on the other side :  The common pleas had no right to inquire into the regularity of the proceedings of the trustees ; if any irregularity existed, the remedy of the party was by *certiorari* to the trustees, or by action of trespass. 2 Johns. R. 190. 4 Cowen, 190.   A sheriff is not bound to act personally in the execution of process of this kind ; he may perform his duties by deputy in all cases, unless specially commanded to act in person.   Bacon's Abr. tit. Sheriff.   The return made in the name of the sheriff, that he had summoned the jury, could not be contradicted.   The court can look only to the panel re-

turned, and will not inquire as to the copy furnished the party ; the allegation on this subject may be cause of complaint against the sheriff, but constitutes no error in the record. The substitution of one juror for another is immaterial, 12 East 229, and the objection that the jurors were inhabitants of the village of Brooklyn is without force, as only those whose property was liable to be assessed were interested, and no such objection was urged.

*G. Wilson*, for defendant in error. The act of 1824, amending the act incorporating the village of Brooklyn, authorizes the *laying out of new streets* only in cases where the owners of the lands through which such streets are to run *consent* to the proceeding. Laws of 1824, p. 224, § 5. The consent of Patchen not having been obtained, there was a total want of jurisdiction, which may be objected in any stage of the proceedings, 5 Mod. 149 ; 2 Salk. 492, S. C.; 9 Cowen, 227 ; and the error may be corrected by writ of error. 2 Cro. 96. 2 Cowp. 296. There being a *house* on the lands taken for the street, and Patchen not having consented to the laying out of the street, but on the contrary, throughout the whole proceedings, having objected to it, the trustees had no authority to appropriate the lands to a street. 4 Cowen, 190. The common pleas had no jurisdiction, unless the statute was strictly complied with. Comb. 462. 9 Cowen, 227. The trustees had no right to apply for a precept, but upon the application of a majority of the persons owing property intended to be benefitted by the laying out of the street, and Patchen should have had notice of such application, so that he might have seen that it was in conformity to the statute. Where a special duty is assigned to the sheriff, he should perform it *in person*, and not by deputy ; in cases of *partition, waste* and *view*, he is required to attend personally ; 1 Fitzh. N. B. 61 r, 55 c ; 6 Co. 12 ; Year Books, 67 a; 5 Comyn's Dig. tit. Retorn; 10 Johns. R. 107; 2 id. 194 ; and if so, he ought to have discharged in person the duty enjoined upon him in this case. But if the duty could be performed by deputy, the panel could not be altered after a copy had been furnished to the party interested in the proceedings, who was entitled to such copy, to enable him to see

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

whether cause of challenge existed to any one of the array. If the panel could be altered after furnishing such copy, all benefit arising from being furnished with it was lost. The case in 12 East is overruled in 5 Barn. & Cres. 254, and 2 Marshall, 154. Again the jury were not empannelled in due season; three days before the return of the precept, the panel was not complete. The fifth section of the act should be construed as requiring the sheriff to empannel and return a jury 14 days before the return of the precept, because at the same time it is made his duty to summon the owner. This must be the construction of the act, or one day's notice to the party may be sufficient, if the construction is correct that the 14 days relate only to the time between the teste and return of the precept. The common pleas erred in relation to the *view* of the premises, which should have been had by the whole panel, and not by such of the jurors only as chose to have a view ; and it should have been had under the charge of the sheriff. How could the jury discreetly exercise their duty ? What assurance was there that the right premises would be viewed? Besides, whether there shall be a *view* or not is confided to the discretion of the court, and not of the jury. As to the practice in relation to a view, the counsel referred to 1 Sellon's Pr. 440. A justice's judgment is reversed when it does not affirmatively appear that the jury were attended by a constable ; and it not appearing in this case that the jury were attended by the sheriff, the presumption that he did attend will not be indulged.

The motion for a postponement should have been granted. To grant or refuse such application, it is conceded, is a matter of discretion, but it is a legal, and not an arbitrary discretion ; and where the usage of courts is uniform in a given case, such usage ripens into a right, and it is no longer matter of discretion. 5 Wendell, 114. The practice of courts to put off the trial of a cause for the want of a material witness, where a party requiring his attendance has used due diligence to obtain his attendance, is uniform ; and where such application has been refused, and a verdict rendered against a party asking for a postponement, the verdict has been set aside. 1 Dowl. & Ry. 159. 4 id. 735, 830. 2 id. 420. 5 Cowen, 15 ; 6 id. 577. It

is admitted, on the other side, where in *justice's courts* an adjournment has been improperly refused, the judgments have been reversed for error. Why not extend the same principle to all subordinate tribunals, whose proceedings are subject to review in the supreme court?

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
. v.
Patchen.

The counsel protested against the doctrine of 7 Johns. 541, that the court before whom the proceedings were had should be considered only as *commissioners*, and not as a *court*. Where jurisdiction in any matter is given to a court, it has the right to exercise all the attributes of a court—may subpœna witnesses, and exercise all other functions appertaining to a court and ordinarily exercised for the advancement of justice. The objection that the question of the refusal of the common pleas to postpone the hearing was not the subject of review on error in the supreme court, cannot be raised in this court, as no such objection was taken in that court.

*B. F. Butler*, in reply. The *certiorari* was directed to the *judges* of the common pleas of Kings, and not to the *trustees* of the village, or to the *officer* who issued the precept by virtue of which the jury were summoned. Nothing, therefore, is properly before the court but what was before the common pleas or done by them. If error intervened in the proceedings of the trustees, the *certiorari* should have been directed to them, or if the judge erred in the issuing of the precept, he should have been called upon by like writ. 5 Wendell, 530. The requisition made by the trustees is in the form prescribed by the statute, and besides, sets forth the whole proceedings; if error appears in these proceedings, the party may avail himself of it, but none appears, and none will be intended. Notice to Patchen of the application to the trustees was not necessary; the proceeding is unknown to the common law, and the statute does not require notice, and from the fact that notice of the empannelling of the jury is required by the statute to be given, and not of the application, the fair intendment is that no other notice than that directed by statute was necessary.

Could a *new street* be laid out *without the consent* of the owner, through whose lands it was to run? It is submitted that the legislature could not have intended a distinction between

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

the laying out of a new street and the widening or altering of an old street; the rights of individuals might be as materially affected in the one case as in the other, and the power to the trustees was equally necessary in both cases. The language of the act is not very distinct; the trustees are empowered to lay out new streets, if the owners of lands through which such streets are to run, will, on reasonable recompense, consent to the same; if the consent of the owner is absolutely necessary, why should the words "reasonable recompense" have been used? If the owner refuses to treat as to the recompense to be made to him, a jury are to inquire and assess the recompense; why should this provision have been inserted, if the consent of the owner was indispensable? But be the construction what it may, the question is not properly before this court; the trustees were not bound to shew consent in this requisition for a precept, and the objection was not urged in the common pleas; if consent was necessary, this court will presume it.

The act of the judge in issuing the precept is unexceptionable. The October term was adjourned, and a new precept issued reciting the former proceedings. The judges of the common pleas, acting as commissioners, could not award a *distringas*, and a new precept issued of necessity on the first requisition, and no injury is pretended from the summoning of a second jury. When the second process was returned, Patchen objected to the panel, which may be considered as a challenge to the array. Was there any cause for challenge? There was no panel until the return, and what was done previously is immaterial, unless done fraudulently. The fact of the jury coming from Brooklyn was no cause of error, unless it had been shewn that the jurors were interested. Nor is it an objection that the jury were summoned by a deputy; sheriffs having the power expressly given to appoint deputies, all acts which a sheriff can do may be performed by deputy—the ancient usage of sheriffs doing certain acts *in person* is not applicable here. The circumstance of there being a *house* on the premises, did not invalidate the proceedings. In 4 Cowen, 190, it was held that *buildings* must be considered as included within the exception of the general highway act restricting the

powers of commissioners in laying out roads, but in the act under which the proceedings in this case were had, there is no such restriction.

The principal question, however, in this case is, had the supreme court the power on *certiorari* to review the refusal of the common pleas to postpone the proceedings? and if so, did the common pleas decide correctly? The affidavit on which the motion to postpone was made was defective in omitting to state that the attendance of the witnesses could be procured at the next term, and besides, the witnesses could not be material, from the very nature and subject matter of the inquiry to be passed upon by the jury. There is not and cannot be any fixed rule as to the postponement of a trial—each case necessarily must depend upon its own circumstances, and the question must be left to the sound legal discretion of the tribunal before which the proceedings are had. The supreme court have reviewed the decisions of *circuit judges*, and of *referees* in causes depending in that court, and corrected what were deemed erroneous exercises of discretion, but never until now have they reviewed the decisions of inferior tribunals upon such questions. The case in 5 Wendell, 127, contains a full and explicit view of the doctrine upon this subject, and establishes the principle, that the decisions of inferior tribunals upon questions resting properly in discretion, will not be reviewed, and that only where such courts have no discretion, will the supreme court control them; and at all events, that the supreme court will not interfere but in extreme cases. This ground may be urged here, although not taken in the supreme court, for it arises on the record. But if the decision of the common pleas could properly be reviewed, it was correctly made. The common pleas acted as *commissioners*, and not as a *court*; they could not compel the attendance of witnesses, 1 Johns. C. 179; 8 Cowen, 13; and why postpone proceedings which do not contemplate the calling of witnesses. A proceeding of this kind is like the proceeding by writ *ad quad damnum*, which is in the nature of an inquisition. As to the *view*, the objection that the sheriff did not attend, is no cause for reversing the judgment of the common pleas; the premises were described in the precept, and

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

in the oath administered to the jurors, consequently there was no need of *shewers* to be appointed.

The following opinions were delivered :

By the CHANCELLOR. The statute under which the proceedings in this case were had, is so obscurely drawn that it is somewhat difficult to decide what powers were intended to be given to the trustees as to laying out *new streets*, without the consent of the owners of the land to be taken for that purpose. I think, however, that it was not intended by the 5th section of the act of the 9th of April, 1824, to grant such power in cases not coming within the provisions of the *general statute* relative to the laying out public highways. For the purpose of understanding the provisions of this section, it is proper to refer to the act incorporating the village, of which the act of 1824 was an amendment. The act of April 12th, 1816, gave to the trustees within the limits of the village all the powers of commissioners of highways. They, therefore, had a right to lay out a street or highway in any part of the village, provided it was done with the consent of the owner of the land over which it was laid. They had also the right to lay out such public street or highway without his consent, where there were no houses, orchards, gardens, &c. to obstruct the exercise of those general powers; but there was a still further provision in the act of 1816, which it is proper to refer to. By the 18th section of that act, Laws of 1816, page 95, the trustees were authorized to enter upon any lands in the village which they might deem necessary to be surveyed, used and converted to laying out, opening and forming any street or highway, and it was made their duty as soon as it could conveniently be done, to cause a survey and map of the village to be made, exhibiting the streets, roads and alleys to be permanently laid out, and accompanied by such remarks as the nature of the subject might require and admit ; which map was to be signed by the president of the village, and deposited with the clerk for inspection, so that no resident could plead ignorance of the permanent plan to be adopted for opening, laying out, levelling and regulating the streets of the village. The 5th section of the amendatory act, Laws of 1824, page

225, authorizes the trustees, on an application in writing of a majority of the persons owning the property to be benefitted by the improvement, or which is to be assessed for the expense thereof, to *widen and alter* all streets and highways *already laid out* to such breadth, not exceeding sixty feet, as they may judge fit; and to *lay out* and make such *other roads and streets* as they shall think necessary, *if the owners of the lands, through which such new roads and streets are to run, will, on reasonable recompense, consent to the same.* The statute then provides for the assessment of the damages in either case, if the trustees cannot agree upon the amount with the owners or proprietors of the land. Two distinct cases appear to have been intended to be provided for by this last act; the one, the widening and altering of the streets and highways which had been already laid out and marked upon the map or permanent plan of the village, according to the act of 1816; the other, to provide for the laying out of new streets, not already opened or laid out. As to the first, the only restriction imposed upon the trustees appears to be, that the streets should not be extended beyond the width of sixty feet, and that they should not be widened, except upon the written application of a majority of the persons whose property was to be assessed to pay the expense of the improvement. But in the last case, when new streets were to be opened, not already laid out and marked upon the map or permanent plan of the village, the legislature seem to have intended to impose a still further limitation upon the powers of the trustees, viz. that they should have no right to alter the original plan in this respect, unless the owner of the property taken for the new street was willing to relinquish it for that purpose, on receiving a reasonable recompense therefor. In either case it was necessary that the value of the property taken should be assessed in some way, if the trustees could not agree with the owner as to the amount of the recompense to be received therefor, because the amount of such damage or recompense was to be assessed upon the property which was benefitted by the improvement. It was in this respect like the ordinary case of laying out a highway through improved land. The commissioners cannot lay out the road through an orchard or garden of four years standing

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

without the consent of the owner ; but if the owner consents to the laying out such road upon receiving a reasonable compensation for the damage sustained, the commisioners may lay out and establish the same as a public highway at the expense of the town, and in that case the damages of the owner of the orchard or garden are to be agreed upon by him and the commissioners, or assessed by a jury, as in ordinary cases where the consent of the owner was not required. 2 R. L. of 1813, 275. 1 R. S. 514, 515. As there was a *house* upon the premises, the trustees had no right to take the property for a street, by virtue of their general powers as commissioners of highways, and as the land was taken for a *new street,* the consent of the owner was necessary, according to the construction which I put upon the act of 1824.

Neither the judge to whom application was made for the precept, nor the court of common pleas, before whom the assessment of damages was to take place, had authority to inquire into the regularity of the proceedings by the trustees. If their acts were void, the remedy of Patchen was to prosecute for the trespass, or to apply for an injunction, to restrain them from pulling down his house, &c.; and if they were voidable merely, they should have been corrected upon a *certiorari,* directed to the trustees. But when the trustees applied to the judge for a precept, and to the court to have the damages assessed, they should, upon the face of their requisition, have stated sufficient to shew that they had authority to lay out the street, and to apply for an assessment of damages— they should have stated that the new street had been laid out, *with the consent of the owner* of the house and lot over which the same was laid. In all other respects, I think the requisition was sufficient to give jurisdiction to the court of common pleas to assess the damages.

The question as to the right of the trustees to lay out a new street not surveyed and designated on the original plan of the village, does not appear to have been presented to the supreme court in this light. The opinion of the chief justice, therefore, only relates to the taking of lands on which buildings are erected for the purpose of *widening* the streets. In this respect the decision of the supreme court is unquestionably correct. Wher-

ever the trustees were authorized to take lands, under the act
of 1824, and not by virtue of their general authority as com-
missioners of highways under the previous act, they had the
right to take orchards, gardens and buildings, as well as the
land.   The conclusion to which I have arrived on the defend-
ant's first point, would be sufficient to justify my vote for the
affirmance of the judgment of the supreme court.   But as
other members may not have taken the same view of this
question, I will proceed to examine some other objections
which were made to the regularity of the proceedings before
the common pleas.

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

   The objections that the jury came from the village of Brook-
lyn, and that they were empannelled and summoned by a
deputy sheriff, and not by the sheriff in person, I think are un-
tenable.   The owners of the adjacent property, and not the
inhabitants of the village generally, were to be assessed for
the amount of damages sustained by the taking of the land
which was required for the street.   Other persons, although
residing in the village, had no more interest in this question
than the inhabitants of the county at large.   There is noth-
ing in the statute which confines the exercise of the power of
selecting the jury to the sheriff *personally*.   As a general prin-
ciple, he may execute any ministerial power by deputy.   As
the jury was to be selected by the officer, at his own discretion,
and not, as in ordinary cases, by a ballot from the body of the
freeholders, there might have been a suspicion of unfairness,
if, as alleged, the precept was put into the hands of a deputy
who was brother to the attorney who instituted these proceed-
ings; but that of itself formed no sufficient ground for setting
aside the panel.   There is however, a fact connected with the
empanneling of this jury which deserves more serious consid-
eration.   Although the law has given to the sheriff, or his
deputy, the power of selecting the jurors in the first instance,
when that selection has one been made, and the jurors have
been regularly summoned to attend the court, he has no au-
thority to change them and to substitute others in their places.
This would lead to tampering with officers, and to alterations in
the panel of jurors after their opinions had been ascertained;
and might produce serious injury to the rights of parties.   Af-

ter the sheriff had selected and summoned the jurors, his pow-
ers, on that subject, were spent; and if he afterwards dis-
charged those who had been regularly summoned, and sub-
stituted others in their places, either party had a right to ob-
ject to the regularity of the proceeding. The counsel for the
defendant in error objected to the panel of jurors, as returned
by the sheriff; in support of this objection, he read an affida-
vit showing that on Saturday evening previous to the court,
the deputy sheriff furnished him with a panel of the jurors,
and informed him that only one of them, Mr. Leavitt, remain-
ed to be notified, or summoned. And it appeared from the
panel returned by the sheriff that the names of two of those
persons, John Moor and Alexander Birbeck, had been left
out; and that David Kimberly and John Dezendorf had been
substituted in their places. This was *prima facie* sufficient to
show improper conduct, or an irregularity in empannelling the
jury; and as it was not attempted to be explained, I think the
array should have been quashed or set aside, at least as to
these two jurors. I know such things have frequently been
done by constables and other officers, authorized to select and
empannel jurors. But when such irregularities are brought
distinctly to the notice of a court, in passing upon a case it is
their duty to declare the law, and to correct the proceeding.
This principle does not prevent the officer, when about to sum-
mon a juror, from ascertaining whether there is any thing in
the situation of his family, or of his health or business, which
would render it extremely inconvenient to attend at the time
and place appointed. In such a case, the officer may, in his
discretion, refrain from summoning such person, and may se-
lect some other; but when he has discharged his duty by ac-
tually selecting and summoning the individual as one of the
panel, the parties to the suit have a right to the services of that
person as a juror, unless he has a reasonable excuse for not
serving, to be judged of by the court before whom he is sum-
moned to attend. The objection that one of the jurors appear-
ed for another person who had actually been summoned, was
also made in time. *Dovers* v. *Hobson*, 1 Marsh. R. 154.

I agree with the supreme court that the court of common
pleas had authority to adjourn the hearing of the cause. If

they had no such power, the whole proceeding before them at the time when the judgment was rendered appears to have been irregular; because it was a mere continuation of the proceeding commenced at the previous term of the court. No new requisition was made upon the judge; he issued a new precept, reciting the old one, with a continuation of the proceedings by a *vice comes non misit breve*, in the usual form adopted in courts of record. This is a specially delegated power to *the court* of common pleas, as such court, and not to *the judges* as an *ex officio* duty; and when such a power is committed to a *court*, all the ordinary powers of such court, so far as they are applicable to the discharge of the particular duty, may be exercised as in ordinary cases. The court may compel the sheriff to return the precept; may impose fines upon the jurors for not attending; may issue process to compel the attendance of witnesses; may award a tales, swear witnesses, and compel them to testify; may appoint triors on a challenge of a juror; and may adjourn the hearing of the cause, upon sufficient cause shown. Thus in England, the jurisdiction of the lord chancellor in bankruptcy is a specially delegated jurisdiction, committed to him as the keeper of the great seal; but in the particular cases in which this jurisdiction is exercised, all the powers of his court become applicable to the discharge of his duty—he issues injunctions and attachments to compel the performance of his orders; makes references to masters to inquire as to facts : awards issues, &c. See Exparte Cowen, 3 Barn. & Ald. 123. But no appeal lies from his decisions in bankruptcy, because no law has been passed, authorizing an appeal in such cases. So in the street causes, in the city of New-York, a specially delegated jurisdiction is committed to the supreme court, but I believe it has never been contended that the court was bound to determine cases of that kind at the first term, and that it had not the power of deciding them at any subsequent term of the court.

It is said, however, in this case, that no witnesses were necessary; and that as the adjourning of the hearing rested in the discretion of the court, its decision in reference to such adjournment could not be reviewed by a higher tribunal. Although the judges in their return say they refused the appli-

cation for a new trial, *in the exercise of their discretion,* I think it is evident they mistook the meaning of the term; for they admit they declined hearing the affidavits of the absence and materiality of the witnesses, on the part of Patchen; and undoubtedly came to the conclusion that they had no power to adjourn the trial, and therefore refused to hear any statement of the facts, and ordered the trial to proceed; this they mistook for the exercise of a discretion on the subject. There is no reason to suppose that the court did any intentional wrong to the defendant in error, but the judges have mistaken the law. An improper exercise of discretion, as in refusing a new trial, or the postponement of a cause, in a common law court, is not a ground for a writ of error; but where palpable injustice has been done by an inferior jurisdiction in the exercise of a discretionary power, in opposition to the settled principles of law and equity, their *proceedings* may be corrected, either by *certiorari* or by *mandamus.* Thus when the proceedings before justices of the peace were reviewed on *certiorari* in the supreme court, one of the ordinary grounds for reversing the judgment of the justice was, that he had in the exercise of his discretion refused an adjournment, when he ought to have granted it, had his discretion been soundly and judiciously exercised. *Rose* v. *Stuyvesant,* 8 Johns. R. 426. *Beekman* v. *Wright,* 13 id. 442. The application to put off the trial and the affidavits, and offer upon which it was founded, were a part of the *proceedings* in the *cause* which it was the duty of the judges to return on the *certiorari;* and if they had left out this part they probably would have been liable for a false return. It was impossible for the jury to assess the damages without evidence; suppose a juror from Flatbush had been shown this lot in Brooklyn and asked to fix the value thereof, could he, without obtaining information of others, have told whether the premises were worth one thousand dollars, or ten thousand. I think the trial should have been postponed, long enough at the least to have enabled the defendant to produce the witnesses he had subpœnaed, or to look up others who were well acquainted with the actual value of the property in question.

There does not appear to have been a formal demand by either party for a view. The permission to the jurors to look at the premises was not objected to, and it was calculated to enable them better to understand the testimony, as to location and value. If either party had demanded a view, and it had been granted, shewers would have been appointed and sworn to show the premises to the jury, under the direction of the sheriff.

Without taking the trouble to examine all the other points made in this case, I am satisfied there was sufficient shown by the return to the *certiorari*, to make it the duty of the supreme court to quash the proceedings before the common pleas, and that the judgment in this case should be affirmed.

By Mr. Senator ALLEN. By the fifth section of the act of the legislature amending the act to incorporate and vest certain powers in the freeholders and inhabitants of the village of Brooklyn, in the county of Kings, passed April 9th, 1824, the trustees of the village are authorized to widen and alter all public roads, streets, and highways already laid out, and also to lay out such other roads and streets as they shall think necessary; and if, in laying out any such road or street, the trustees shall require the land of any person for the purpose, they are required by the act to observe the following preliminary measures: 1. Before any proceedings can be had, there must be an application to the trustees, in writing, by a majority of the persons owning the property intended to be benefitted, or whose property shall be assessed for the payment of the expenses attending the same. 2. The trustees must give notice of such application, to the owner of the property intended to be taken. 3. To the end that reasonable satisfaction shall be made for the land, they may treat and agree with the owner for the compensation to be made him. 4. If such owner shall refuse to treat, then it is made lawful for the first judge, or any other judge of the court of common pleas, on the requisition of the trustees, to issue a precept directed to the sheriff, commanding him to empannel and return a jury at the next term of the court, who are to enquire and assess the damage and re-

VOL. VIII. 9

compense due to the owner of the land.   5. The trustees are required to summon the owner of the land, by notice to be left at his most usual place of abode, to appear before such court. 6. The jury being sworn for the purpose, and having viewed the premises, if necessary, shall assess such damage and recompense as they shall judge fit to be awarded to the owner of the land.   The act then declares that the verdict of such jury, and the judgment of the court thereon, and the payment of the award, or tender and refusal, shall be binding to all intents and purposes, and be a full authority to the trustees to cause the land to be converted to the purposes aforesaid.

It fully appears from the record presented to this court, that each of these requisites have been complied with in every respect, conformable to the provisions of the act.   Notwithstanding this conformity in the proceedings with the provisions of the act, the counsel for the defendant interposes the following objections:  1. That it was the duty of the trustees to have shown the judge that an attempt had been made to treat with Patchen. In the application of the trustees to the first judge, requiring him to issue a precept to the sheriff directing him to empannel a jury, they represent that Jacob Patchen hath refused to treat or agree with them for the said premises, for a reasonable satisfaction.   This was all the judge had a right to require of the trustees, and is a full compliance with the provisions of the statute.   2. That the whole matter before the trustees ought to have been returned to the judge before he issued the precept.   The provisions of the act do not require such return, and the judge had no authority by the statute, to pass upon the proceedings of the trustees.   3. That the defendant had no notice of the proceedings before the trustees, which ought to have been given him.   There is nothing in the law, under which the trustees and court acted, requiring such notice; the only notice directed is, that the trustees have determined to take the property, for the purposes of a street; and the trustees aver that such notice was given to Patchen.   When the duties enjoined by the statute, therefore, are performed, it is neither just or proper to require more.   4. That the jury was empannelled by a deputy, and not by the sheriff in person.   The statute requires that the sheriff shall empannel and return a

ALBANY, Dec. 1831.

President, &c. of Brooklyn v. Patchen.

jury, not that he shall summon them in person. And the fifth section of the act concerning sheriffs, 1 R. L. 421, authorises the sheriff to appoint such and so many deputies as he may think proper; and no person who may be appointed by any sheriff to do a particular act only, shall be required to take the oath required to be taken by the deputy sheriff. In *Tillotson* v. *Cheetham*, 2 Johns. R. 62, it was *held* that the deputy sheriff may execute process in all cases where the high sheriff is not required specially to go in person, or where the thing to be done is not of such a nature as to amount to a judicial act.

5. That the jurors were taken from the village of Brooklyn, and that they ought to be disinterested. By the act of 1816, *sess.* 39, p. 92, it is declared that the freeholders and inhabitants of the village of Brooklyn shall be deemed, and are thereby declared to be competent to sit as jurors, and to give testimony in any cause wherein the trustees are a party, notwithstanding any remote interest which they may have as members of the corporation. A large portion of the inhabitants of this village are entirely disinterested on the subject of the opening of the street in question; it is only those in the neighborhood of the improvement, that have an immediate interest in it; and the objection was not that the jury was taken from the vicinity of the improvement, but general; as a proof that the court were cautious on this point, it is only necessary to refer to the record of their proceedings, in respect to the witness William R. Dean, who, after being sworn, giving the location of certain property owned by him, was considered by the court an incompetent witness for the trustees, and his testimony was excluded, on the presumption that his property would be assessed for the improvement. The trustees were no further interested than as public functionaries, whose duty it was to carry into effect the requirements of those owning property intended to be benefitted, and whose property would be assessed for such benefit. I think there is no weight in this objection.

6. That there was a change in the pannel, by the substituting other persons than those reported to the counsel of the defendant by the deputy sheriff. The sheriff is directed to empannel and return a jury, to appear before the court. The jury cannot be considered as empannelled, until the sheriff

makes his return in court, and admitting that the sheriff sub-
stituted others for those on his original list who were sick or
absent, where was the impropriety? Besides, the informa-
tion communicated to the counsel of Patchen by the deputy
sheriff, as to who were on his list and who he had summoned,
may have been true, or it may not; and it would be the height
of impropriety to impeach the conduct of the sheriff, merely
from a report of a conversation between his deputy and an-
other person. No objection was made to the character or
qualifications of either of the jury, and nothing appears to
shew that Patchen was prejudiced or injured by the fact
as stated by the counsel. There was no reason why the jury
should be set aside for that cause. In *King* v. *Edmons*, 4 Barn.
& Ald. 471, the sheriff's officer had neglected to summon one
of the twenty-four special jurymen returned on the panel, and
it was *held* that this was no ground for challenge to the array.

7. That a view of the premises ought not to have been held
by the jury, without the attendance of an officer of the court.
The law does not absolutely require that the premises shall be
viewed by the jury; they are to view the premises, if necessa-
ry, and whether necessary or not appears to be left to their dis-
cretion. We have no reason to doubt, however, but that they
did view the premises, as they were informed by the court, af-
ter being sworn, that such of them as wished might view
them, and attend the court the next day. Neither does it ap-
pear from the record that an officer did not attend them; and
it not appearing that an officer did not attend them, it ought
to be taken for granted that he did. But, in either case,
there is no provision of the statute making it necessary or
proper that the jury should be attended by an officer; and
there being no pretence on the part of the defendant that
undue influence was exercised by any one while the jury
were viewing the premises, the objection must fail.

8. That there was a *house* on the land proposed to be taken,
on which the statute is silent, and therefore the taking of the
house was illegal; and that the defendant did not consent to the
laying out of the new street, but always opposed it. When
the legislature authorized the trustees to widen all public
roads, streets and highways, already laid out in the village,

and also to lay out and make such other roads and streets as they should think necessary and convenient, they knrw that old streets could not be widened, or new ones made, without removing such buildings as might obstruct the operation ; and there being no prohibition to the removal of buildings, I think the act may be fairly construed, while it empowers the trustees to lay out and make new streets, that it does not withhold so necessary an authority to its fulfilment as would prevent the carrying into effect the provisions of the statute. That the defendant did not consent to the improvement, or was unwilling to treat with the trustees, cannot be doubted, as his opposition was palpable and manifest in every stage of the business. By the provision of the statute that the trustees may open such new street, if the owner of the land required for the improvement will, on reasonable recompense, consent to the same, the legislature, as I think, intended the same as they did in the directions to the trustees to endeavor to treat and agree with the owner, in order that reasonable satisfaction shall be made for all such land as shall be taken ; and in the event of such owner refusing to treat *in manner aforesaid*, to wit, by consent on reasonable recompense, or by treaty for reasonable satisfaction, then it shall be lawful for the first judge, on the requisition of the trustees, to issue a precept for empanelling and returning a jury, to assess the damage and recompense due the owner of such land. Any other construction of the statute would tend to make it inconsistent with itself ; for if a street cannot be opened without the consent of the owner of the land, why summon a jury to assess the damage and recompense ? If the land cannot be taken, except on such recompense as the owner may agree to take, there is certainly no use in having the opinion of a jury as to its value. In the case of *The People* v. *A Turnpike Company*, 2 Johns. R. 190, the complaint was, that the road had been opened and used through the land of M. and others, without any offer having been made them to agree upon the compensation, and without having the damages ascertained according to law. The court *held*, if the defendants had not followed the directions of the act, relative to compensation to be moved to the owners of the land through which the road had been made, they are tres-

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

passers, and the complainants have adequate remedy in the usual course of the common law ; that the people were no way interested in the controversy or complaint, which was deemed a sufficient reason for not granting the extraordinary remedy requested.    If in any of the foregoing objections, therefore, the trustees have proceeded contrary to law, they are trespassers on the property of the defendant in error, and he has an adequate and competent remedy against them, by the usual course of the common law.

9. It appears from the case, that the counsel of Patchen moved the court to postpone the cause, on account of the absence of material witnesses, due diligence having been used to procure their attendance ; and that, in support of such motion, an affidavit was offered, deposing that Col. Hunter of the city of New-York was a material witness for Patchen, without the benefit of whose testimony he could not safely proceed to trial, as he was advised by his counsel, and verily believed to be true.    The court, however, in the exercise of their discretion, refused the application, and ordered the jury to be sworn. This refusal, it seems, is the principal ground relied on by the supreme court, for ordering the proceedings of the common pleas to be set aside.    The only authority cited in support of this decision is *Hooker* v. *Rogers*, 6 Cowen, 577.    The action was for publishing a libel.    At the Washington circuit the defendant moved to put off the trial of the cause, on his affidavit that J. L. Thurman was a material witness for him, without whose testimony he could not safely proceed to trial, as he was advised, and verily believed ; that he went to the house of Thurman for the purpose of subpœnaing him, but found him confined to his bed by sickness, and unable to attend court. The circuit judge deemed the affidavit insufficient, and refused to put off the trial ; and a verdict was obtained by the plaintiff.    On a motion to set the same aside, the supreme court *held*, that the affidavit was clearly sufficient, it being the first time the cause had been noticed for trial.    The usual affidavit was enough on the first notice of the trial, *unless circumstances of suspicion appear in some way, inducing a belief that the application was intended merely for delay*.    There is a material

difference, however, in the facts and circumstances of this case
and the one under consideration. The one was a trial at
common law, and before a circuit judge, while the other was
an inquest, the court acting as commissioners, on a special
matter, under the statute. In the former, the defendant tes-
tifies that he went to the house of the witness for the purpose
of subpœnaing him, but found him confined to his bed by sick-
ness, of which sickness it appears he died ; while in the lat-
ter, no cause is assigned for the absence of the witness, and it
only appeared that he had been regularly subpœnaed to attend.
In addition, it was stated, in support of the application, that
one John Kent had, at three several times previous to the ap-
plication for opening the contemplated street, offered Patchen
the sum of $17,500 for the property, which offer Patchen be-
lieved to be a *bona fide* offer. Who this Mr. Kent is, we are not
informed ; he may be a man of substance, or he may not ; and
in the absence of the necessary information, combined with the
amount offered, so wide from the sum awarded, I think I have
a right to doubt the sincerity of the offer. *Ogden* v. *Payne &*
*Holmes*, 5 Cowen, 15, was cited on the argument in support of
the opinion of the supreme court. In that case the defendant
made affidavit that L., the attorney of the plaintiff, was a ma-
terial witness for him in the cause, as he was advised, and be-
lieved to be true. The motion for postponement was refused
in the court below : and the supreme court *held*, that the
judge had a discretion in certain cases, whether he would put
off the trial upon the common affidavit. This is a very prop-
er rule, and it is important that it should at times be exercised,
to prevent delay ; but the rule does not apply, unless by coun-
ter affidavits, or otherwise, circumstances of suspicion are made
to appear. The court say, we do not see that suspicion could
attach from the mere fact that the witness was attorney for the
plaintiff. There is nothing unusual in such a circumstance.
This cause, it will be observed, was also a trial at common
law, while the one under consideration was a mere inquest to
ascertain the value of a piece of land. In both the cases cited,
as well that referred to by the supreme court as that cited
by the counsel for the defendant in error, the supreme court
proceed upon the principle that nothing appeared to induce the

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

court below to suspect that the motion for postponement was made merely for delay. But was there no reason in the case before us to suspect that the motion of the defendant below was a subterfuge for delay? The first precept was. issued on the 30th of September, 1825, which directed a jury to be empannelled and returned on the third Tuesday of October, 1825, that being the next term of the court, at which time the defendant, in his proper person, appeared, but in consequence of the sickness of one of the judges, the court was adjourned until the third Tuesday in April, 1826. By this adjournment, the defendant is allowed six months, in addition to the time between the first notice of the trustees and the third Tuesday in October, to prepare himself with his witnesses and counsel; but it appears that no witnesses were sworn or examined, on the part of the defendant, on the trial of the cause; and when we add to this fact, the opposition of the defendant in every stage of the matter; his refusal to treat with the trustees; his motion to set aside the pannel before the jury was sworn; his objection to the jury, because they were taken from Brooklyn, and were summoned by a deputy sheriff; that the whole proceedings of the trustees were irregular; that the law did not authorize the taking of buildings in laying out streets; that no notice was published in the newspapers of the intention of the trustees; that the testimony of Hicks, a witness on the part of the trustees, should be excluded; and finally, the motion for postponement, on account of the absence of material witnesses; had not the court a rig'it to suspect, from these circumstances, that the object of the motion was delay, and not on account of the materiality of the witnesses?

If witnesses were wanting, whence could they be selected with greater propriety than from the village? To suppose that Hunter and Kent, the witnesses named by the defendant, who resided in New-York, would be capable of forming a more correct judgment of the value of property in Brooklyn than the freeholders of that village, is not very probable. The street to be opened by the occupation of the land of the defendant is represented by the record to be 51 feet in width at Fulton street, and 54 feet at James street, and only 108 feet in length. It appears by the map of Brooklyn, that the street opens in

Fulton street, about 300 feet northwest of the intersection of
Fulton and Main streets ; only such of the inhabitants of the
village, therefore, as resided north and west of the new street
will be accommodated by the opening of it, giving them in-
gress to the market place by the new street, instead of going
up to the intersection of Fulton and Main streets, and thus
down to the market.  Such of the inhabitants, however, who
reside to the south and east of the new street, and who, I
should presume, are much the largest portion of the popula-
tion, are not benefitted in the least by the improvement.  There
could have been no difficulty, therefore, to obtain, either as ju-
rymen or witnesses, any number necessary, of disinterested
persons for the purpose.  The offer made by John Kent, a re-
sident of New-York, of $17,500, when compared with the tes-
timony of George Hicks, an owner of real estate in the village,
is a strong circumstance to induce suspicion of the real motive
for postponement.  Mr. Hicks, on his oath, declared that the
property in question was worth, $5,500.  Now, that any per-
son, in his sober senses, would offer $12,000 more for a
small piece of ground than the sum declared by a respecta-
ble citizen to be its value, appears to me incredible.  I think,
therefore, that there were strong reasons to induce the court
below to suspect that the motion for postponement was intend-
ed only for delay.

In the case *ex parte Bailey*, 2 Cowen, 483, the court observ-
ed, " As to the remedy by mandamus, it may be proper to re-
mark, that though in extreme cases we might interfere, and
control the court below, upon questions of fact, presented in
the form of a motion for a new trial, yet it is a remedy which
should be used very sparingly.  A contrary course would
draw upon this court, whenever one of the parties should be
dissatisfied with the decision of the common pleas, an exami-
nation of those questions which address themselves merely to
the discretion of that court.  We should be perpetually ap-
pealed to for the adjustment of rights undefined by law.  This
would result in an endless conflict of opinion, upon questions
which must from their very nature, be finally determined by
the court below, because they cannot be reached by the rules
of law ; and although we may think the inferior jurisdiction

has erred, yet we will not interfere." It is true, that extreme cases may be supposed, which would form an exception to this doctrine. The question was not on a motion for postponement, but for a new trial; and although the facts are not precisely the same as those in the case under consideration, the reasons which guided the decision are equally applicable to both; and it appears to me had the supreme court, in making up their opinion in the present case, adverted to the one just quoted, they would never have deemed the one under consideration an extreme case. They admit, and, as I think, very properly, that they ought not to enter into an examination of those questions which address themselves merely to the discretion of the court below. There are circumstances in every case, and particularly in cases like the present, which cannot be known or appreciated by the supreme court, and which may have great weight with the court below. The litigious disposition of the parties, the local knowledge the judge may possess of the matter in controversy, and the general character of the witnesses, are circumstances that will have weight in deciding a question for postponing a cause, and which cannot be known or appreciated by the appellate court.

*Rex* v. *D'Eon*, 3 Burrows, 1514, was a case of libel against the defendant. A motion was made to put off the trial, on account of the absence of witnesses, whom the defendant stated were material, and that he could not safely go to trial without their evidence; and that he had hopes and expectations of procuring their presence by the next term. The court observed, that an affidavit in common form may be sufficient, where no cause of suspicion appears: but men take such latitude to swear, in the common form, that where suspicion arises, from the nature of the question, or from contrary affidavits, the court will examine into the ground upon which the delay is asked. The court were unanimous in the opinion that there appeared no sufficient reason for putting off the trial. This is a much stronger case than the one under consideration, the witnesses being abroad in a foreign country, and consequently their attendance more difficult to obtain; the court entertained suspicion that the motion was for delay, and not for a legitimate cause, and therefore, in their discretion, they refused the postponement.

*Nichols* v. *Williams*, 8 Cowen, 16, was an application to one of the judges of the common pleas of the county of Washington for process to remove a tenant at will, under the act of 1820. In the progress of the cause, a jury was empanneled to try the question, when Nichols, the defendant below, moved an adjournment on an affidavit of the absence of material witnesses. The motion was denied by the judge on the ground that he wanted jurisdiction and authority to grant an adjournment; the trial proceeded, and judgment was given for the plaintiff below. On appeal to the supreme court, Savage, Ch. J., observed: " The only question is whether the judge ought not to have postponed the trial for a reasonable time to enable the defendant to obtain his witnesses. The judge states he would have done so, if he had thought himself authorized by the act. The act is silent as to any adjournment. It is a general rule, that all inferior jurisdictions must strictly pursue the authority under which they act. It seems to follow that there was no authority to adjourn. If such is the case, great injustice may possibly be done; and if the power is assumed, great and unwarrantable delays may be the consequence. It is better that the legislature provide the proper regulation on the subject, than that each officer authorized to act under the statute should establish a practice for himself. I am inclined to think the judge decided correctly, and that the proceedings must be affirmed." This was a case under a statute, somewhat similar to the one under consideration. Both acts are silent on the subject of adjournment, and if the judge acted right in refusing the motion in the one case, it could not have been wrong to have followed the same rule in the other. It is said to be a general rule, that all inferior jurisdictions must strictly pursue the authority under which they act, and in this the court was undoubtedly correct; for, unless the judiciary are paramount to the legislature, it would seem to be indispensable that they should be kept within the authority delegated.

In *Stafford* v. *The Mayor, &c. of the City of Albany*, 7 Johns. R. 540, it was *held* that the mayor's court of Albany, in executing the powers granted them under the act of the 4th of April, 1801, sess. 24, ch. 153, as to taking ground to widen

streets, act as *commissoners*, and not judicially as a *court;* the power must be strictly pursued, and after the court have affirmed an assessment made under the act, they cannot set it aside for any cause, but are bound to pay the money according to the assessment. No formal record is necessary in regard to the proceedings under the act; but, it seems, they may be removed by certiorari, in order to be examined and corrected by this court. The 13th section of the act alluded to is nearly word for word the same as the 5th section of the act under which the court of common pleas of the county of Kings proceeded in the case under consideration; and if in the one case the mayor's court of Albany acted as commissioners, not as a court, and were bound strictly to pursue the power given them by the statute, it must follow that the common pleas of Kings also acted as commissioners, and possessed none of the powers or attributes of a court, but were bound to pursue strictly and without deviation, as they did, the authority given them by the legislature.

*In the matter of the Mayor, &c. of the City of New-York,* in improving *Beekman-street,* 20 Johns. R. 269, the court *held* that the powers of the supreme court, under the act of 9th April, 1813, are strictly confined to the authority delegated by said act, and donot come within the general powers and jurisdiction of the court; and in the exercise of the powers so given by the statute, the judges act collectively as *commissioners* rather than as a *court.* The same reasons why the supreme court only act as commissioners, in performing the duty imposed upon them in passing upon the reports of the commissioners of estimate and assessment, will apply to the court of common pleas of the county of Kings, as well as to the supreme court or the mayor's court of Albany, to wit, that the duties they severally perform in these respects are delegated to them by statute, and not by the rules of the common law, or the course of proceedings in courts of equity.

On the whole, if the common pleas, " in some respects, act as a court during the pendency of the proceedings," as intimated by the court below, although in S*tafford* v. *The Mayor of Albany,* they decided that the court, in taking the ground of any person for widening streets, act as commissioners, and not

judicially as a court, I have nevertheless shewn, from the evidence and circumstances of the case, that strong suspicions did attach to justify the opinion that delay only was the motive for asking a postponement of the question, and that therefore the motion was refused, in conformity with the rule contended for in *Hooker* v. *Rogers* and *Ogden* v. *Payne.* If however, the court of common pleas acted as commissioners, as it clearly appears they did, then they had no authority but what they derived from the statute, and that neither authorizes an adjournment of the cause, or gives any power to compel the attendance of witnesses; and in accordance with the opinion of the same learned judge who delivered the opinion of the court in the present case, as well as in *Nichols* v. *Williams,* I am authorized to contend that it is a general rule that all inferior jurisdictions must strictly pursue the authority under which they act; and the statute being silent as to adjournment, it follows that there was no authority to adjourn, and therefore that the judge decided correctly in refusing the motion, as well in the present case as the one alluded to, for the want of such authority.

I am clearly of opinion, therefore, under every view of the subject, that the supreme court was wrong, and that their judgment ought to be reversed.

By Mr. Senator SHERMAN. The proceeding in the common pleas was at the instance of the trustees of the village of Brooklyn, who had resolved to open a *new street* in the village, under the act of the legislature, entitled " An act to amend an act to incorporate and vest certain powers in the freeholders and inhabitants of the village of Brooklyn in the county of Kings, passed April 9th, 1824 ;" in doing which, it became necessary to take the *dwelling house* and ground of Jacob Patchen.

The 5th section of the act under which the proceedings were had declares, that the trustees of the village, on the application in writing of a majority of the persons owning the property to be *benefitted* or *assessed*, are authorized to *widen* existing streets, and *lay out* and open new ones, if the owner of *lands*, through which they are to pass, shall, on reasonable re-

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

compense, consent to the same; and if in so doing they shall require the lands of any person, they shall give him notice, and may treat and agree with him about a reasonable satisfaction for the same; and if he shall refuse to treat, it shall be lawful for the judges of the common pleas, on the requisition of the trustees, to issue a precept to the sheriff, commanding him to empannel and return a jury to appear at the next term of the court, to enquire of and assess the damage and recompense due, and to summon the owner to appear; which jury being first duly sworn, and having viewed the premises, if necessary, they shall inquire and assess such damage as they shall judge fit to be awarded the owner for his interest in the same; and the *verdict of the jury* and *judgment of the court*, and payment or tender of the money shall be binding on the owner, and authority to the trustees to convert the lands for the purpose aforesaid. The act then provides that in both cases the recompense may be assessed upon the owners of the land benefitted. *The first part of this section was no doubt intended to give to* the corporation a power which they did not possess before; that is, on opening a new street by agreement with the owner of the ground about the recompense to be paid, the right to assess such recompense upon the persons benefitted. But where the owner and the trustees do not agree about the compensation, as in the present case, then the trustees are to pursue the requirements and intention of the act; and the question now is, have they been complied with in the present case.

Taking the property of an individual without his consent, is one of the highest powers that can be exercised under the constitution. But such are the terms of the general compact, made and continued by the sovereign people of the state, of whom Mr. Patchen is one, that private property may be taken for public purposes, on making a just compensation therefor; but the constitution further says, no man shall be deprived of his property but by due process of law. The legislature is the only power to direct when and in what manner this power is to be exercised. From the propensity of looking into the English books for a precedent for almost every thing, our acts on this subject have generally prescribed a summary

mode of proceeding, and in some cases rather too summary. They are no doubt taken from the ancient writ of *ad quod damnum*, as it is called; a writ which originated under Edward the first, and was a summary mode of inquiry, by a sheriff and twelve men going upon and viewing the ground, what damage the king or the lord of the fee would sustain by permitting the land in question to be given or conveyed to the clergy and pass into *mortmain*. It was then used, and still is in many cases in England to protect the public and the lord of the fee against the individual, who was a purchaser; but it is used with us to protect the owner against the public, who take without purchase. It has been resorted to in modern times in England for other purposes, such as diverting an old road, and taking ground in exchange for that purpose; but in such cases it appears, 3 Atk. 766, the party damaged is heard before the jury. Chancellor Hardwicke says: " On an appeal from the sessions, the only question is, was the party prevented from being heard and laying his evidence before the sheriff's inquest by a too hasty proceeding? I cannot subscribe to the idea suggested by the counsel for the appellants, that the proceeding under the act in question was intended as an *ex parte inquiry*, because the taking of the ground could not be contested before the court, and the value could be ascertained only by a view of the premises. If the owner could not contest the right of taking, he had, or ought to have the right of asserting what the constitution gives him, a claim to a just compensation. I see no reason why he ought not to be as fully protected in the maintaining of this right, as he would be in any other question of property between himself and an individual. The Brooklyn act appears to contemplate a more extended inquiry, and partakes more of the nature of a proceeding in court than some other acts on the subject of taking private property. But the proceedings under it in this case have not been, it is contended, in conformity with its manifest intention; that they shew a haste and inattention to the rights of the owner of the ground, going far to subject them to the charge of being arbitrary, if not partial.

Several objections were made to the proceedings in the common pleas, all of which were overruled. 1. It was ob-

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

jected that the jury had been erroneously summoned by a deputy sheriff instead of being summoned by the sheriff in person, and that the names of two persons had been substituted as jurors in the place of two others previously summoned; 2. That the irregularity of the proceedings of the trustees ought to have been proved; 3. That Patchen had a house on the premises, not included by the word *lands ;* and 4. That he had no notice of the proceedings before the trustees. On which I remark, 1. By the return it appears that the *sheriff* did empannel and return the jury, though the deputy summoned them as he is authorised to do when the sheriff acts ministerially as he did here. 2 Johns. R. 62. The affidavit does not shew clearly that the deputy altered the panel, although such a presumption is left to be inferred. The sheriff had a right to summon the jury at any time, provided there were 14 days between the issuing the precept and notifying the jurors. 2. The act authorizes the taking of lands, without excepting buildings or improvements, and is different from the road act. The decision in 4 Cowen, 190, does not apply. If the act did not intend to give the power of taking buildings, I do not see how a street could be widened or extended, where the public convenience required it. 3. The common pleas have no power by the act, of reviewing the proceedings of the trustees, or inquiring whether Patchen had notice, or whether he refused to treat for a just compensation; there appears to be no provision for such inquiry; it is left to the supreme court to review them on certiorari. The supreme court on these points, in my opinion, decided correctly.

The challenge to the jurors on the ground that they were interested in the event of the suit is, I think, a valid objection; not on the ground that they were taken from the village of Brooklyn, and therefore corporators, which would have been a ground of objection, had not the act of 1816, vol. 4 page 92, § 6, been passed, which declares that the freeholders and inhabitants of the village shall be competent jurors and witnesses in any cause in which the trustees are plaintiffs, notwithstanding any *remote* interest they may have as members of such corporation; but this act only removes their ineligibility, and leaves them as they stood before the act of incorporation,

obnoxious to other objections on the ground of interest.  Here
the objection went to shew not a *remote*, but an *immediate* in-
terest; that some might be benefitted, and therefore assessed,
and might have been signers to the petition for opening the
street.  Persons of that description being on the jury would
have been good cause for setting aside the verdict.  This ob-
jection, in my opinion, ought to have been inquired into; and
I think the court were wrong in refusing to hear it.

The important objection to the proceedings in the common
pleas, was the refusal to grant an adjournment to Patchen, on
account of the absence of material witnesses.  An affidavit
was made by Patchen that Col. Hunter was a material wit-
ness, without the benefit of whose testimony he could not pro-
ceed to trial; he had been duly subpœnaed and resided in
the city of New-York, and a similar affidavit was offered to
be made as to two other witnesses.  In answer to this objec-
tion the plaintiffs in error say in their first point, that it was a
discretion existing in the court of common pleas whether they
would adjourn or not; and the exercise of this discretionary
power was not a ground of error.  All the cases on the sub-
ject were referred to in order to establish the general proposi-
tion, that inferior courts of record possess an inherent power of
exercising a sound discretion in deciding on the postponement
of causes and other points of practice; and I think the counsel
succeeded in shewing this as a general proposition.  But the
same authorities shew that while the superior courts consider
this as a general rule, there are exceptions; and that it is not
an irresponsible power in all cases.  The case in 6 Cowen, 577,
says it does not apply to an arbitrary exercise of a discretion;
and in 5 Wendell, 127, the supreme court recognize the gene-
ral principle, but say this does not mean an arbitrary *sic volo*,
and that they do interfere in cases where the inferior court has
denied the party the benefit of an established rule of practice.
Here the appellants appear to concede the ground that the
common pleas in their proceedings acted as a *court* invested
with their ordinary powers.  Unless viewed in this light, they
could not be considered as invested with a discretionary pow-
er; they possessed it as a court before they were called upon to

VOL. VIII.                    11

ALBANY,
Dec. 1831.

President, &c.
of Brooklyn
v.
Patchen.

discharge the duties of commissioners. I think the supreme, court were correct in considering this refusal to adjourn as an arbitrary exercise of discretion. There had been no adjournment of the cause; it was the first application, and made at the first meeting. One adjournment is considered almost a matter of right in all cases, especially when it is in favor of the party proceeded against; he is not supposed to be in that state of preparation at the first meeting that the plaintiff is. The affidavit contained all that was necessary for putting off the cause; and although it did not say in so many words *when* the defendant expected to procure the attendance of the witness, it gave the court sufficient information to enable them to judge of the time, by informing them that he resided in the city of New-York, and had been subpœnaed.

Again, it is contended by the plaintiffs in error, and made the important point in this case, that the judges or the court of common pleas acted as mere *commissioners*, and could exercise no powers but those given by the act under which they proceeded; that as the act does not in so many words confer the power of issuing subpœnas, swearing witnesses and granting adjournments, it can be no error to withhold the exercise of those powers. Several authorities were referred to as in point to establish this position, and 7 Johns. R. 551, and 2 id. 19, were particularly relied upon. I have examined the cases, and none goes further, or is more in point to sustain the plaintiffs, than the case in 2 Johnson. That was a decision of a question arising under the Albany act, from which the Brooklyn act appears, in a great measure, to be copied. The old New-York act in relation to streets, before the mode of proceeding by commissioners was adopted, appears to be the same, and under that act the practice was to examine witnesses in court on both sides. In the case in 2 Johnson, the court decided that the common pleas acted *quasi* commissioners, and after having gone through their proceedings to judgment, had no right to set that judgment aside for irregularity; that their powers then became *functus officio*. But in that case it appears they not only acted *quasi* commissioners, but *quasi* court; for in arriving at their final result, they necessarily exercised powers as a court, not named in the act. The ques-

tion in that case is distinguishable from this; there it was no ALBANY, Dec. 1831. doubt correctly decided, that after they had given judgment, their powers ended. Nor does that case, in my opinion, go so President, &c. of Brooklyn v. Patchen. far as to say that in their progress to final judgment, they do not act as a court as well as commissioners. I think it follows as a matter of course, and arises *ex necessitati rei*, as it did in this case, that they act in both capacities; and without so act-ing, they could not have given effect to the act. Whence but from their general powers of a court did they acquire the right which they necessarily exercised, of adjourning for the in-disposition of the judge; of issuing subpœnas, of swearing wit-nesses, and a constable to keep the jury together until they had agreed upon their verdict. The act speaks of them as a *court*. The jury are commanded to appear before "*the court.*" The "*verdict,*" of the jury, and the "*judgment of the court*" is the language of the act. The jury by the act are to appear "*in court*" at the next term, and there *inquire* and assess the value of the land, according to the interest of the owner. How and of whom are they to inquire, when seated in the jury box, un-less of witnesses? How are they to ascertain the interest of the owner in the land but by evidence? He may be a free-holder or a lease holder; he may be a tenant in common, with heirs at law; he may have lately made improvements or erected a new building. How are they to get at the value and cost, but by hearing the party and his witnesses? I am satisfied it was the intention of the act that the court should exercise all such powers as should be necessary to give the party a full and fair hearing, and to carry the act into effect. The necessity shews the intention, and it was more necessary under this act, than when the proceedings are had before commissioners performing their duties out of court, for there is no *locus audiendi* or place provided by the act where the party can be heard, except at the inquiry in the common pleas. In New-York the commissioners of estimate and as-sessment are bound to make a report of all their proceedings, and the owner has an opportunity of being heard, not only be-fore them when the report is made, but before the supreme court before the report is confirmed. There the act provides a remedy, and points out the course to be pursued. Judge Spen-

cer, in 20 Johns. R. 269, doubted the right of the legislature to impose these duties on the court. The powers I think cannot be doubted, but there may be a question as to the justice of imposing upon them these duties, without providing additional compensation.

I think the *view* in this cause was irregular. The sheriff ought to have gone with the jury, and kept them together in a body, as in ordinary cases of a view, which I think the act contemplated. Unless that was intended, the act gives them no more power in relation to a view than they could exercise without the act. I cannot believe that the view given by the act was an unmeaning thing. Telling the jurors that those might go who pleased to view the premises, was I think, irregular. I am satisfied that the common pleas acted not only as a court, but as commissioners; that they possessed, and ought to have exercised, all such court powers necessary to carry the act into execution; that in refusing to do that in this case they erred. I am therefore in favor of affirming the judgment.

On the question being put, *Shall this judgment be reversed?* *two* members expressed their opinions in the affirmative, and *nineteen* in the negative. The members expressing opinions in the affirmative, were The PRESIDENT of the Senate and *Senator* ALLEN.

Whereupon the judgment of the supreme court was *affirmed*.